FEDTRO, INC., Plaintiff,

v.

KRAVEX MANUFACTURING CORP., Defendant.

No. 65 C 1169.

United States District Court, E. D. New York.

Jan. 26, 1970.

Morton Amster, George Gottlieb, New York City (Amster & Rothstein, New York City, of counsel), for plaintiff.

Edward Halle, Garden City, N. Y. (Holland, Armstrong, Wilkie & Previto, New York City, of counsel), for defendant.

## MEMORANDUM INCORPORATING FINDINGS OF FACT and ORDER for JUDGMENT

DOOLING, District Judge.

Following the dismissal of defendant's appeal from the permanent injunction the present case came on for a hearing on plaintiff's claims for monetary relief under 17 U.S.C. § 101(b). Plaintiff contends that it is entitled as copyright proprietor (a) to damages suffered due to the infringement, and (b) to all the profits which the defendant made from the infringement in addition to the losses that plaintiff suffered from the infringement. Plaintiff does not seek a recover under the plainly alternative "in lieu of actual damages and profits" clause and "Second" of Section 101(b), but points out that, failing all else, plaintiff would be entitled to as much as a dollar for each infringing copy made or sold by or found in the possession of the defendant and would be entitled to such per copy award free and clear of the limitation to $5,000 that would apply under Section 101(b) in cases in which the copyright proprietor relies upon infringements "occurring after the actual notice to a defendant, either by service of process in a suit or other written notice served upon him."

Without repeating in detail the findings of fact made after the trial of the issue of copyright validity and infringement it may be noted that the infringement that occurred fell into two classes: *First*, the use of depictions of essentially the material taken from plaintiff's cards, in defendant's catalogue distributed throughout the industry and in certain advertising, and, *Second*, the use of a directly imitative card in the marketing of defendant's siphon pump. The infringements occurred in two phases, a *first* phase in which the copying of the material from plaintiff's card was fairly complete and utterly slavish, and, *second*, a much briefer period in which the defendant had somewhat modified the card he used to sell the article and the depictions of it in advertising and catalogue sheets but which still constituted infringement. The damage hearing brought out a possible *third* period of qualitatively different infringement and that is infringement during the period after the service of the final permanent injunction which infringement possibly continued from April 29 or 30 through June 14 or thereabouts. The total numbers of articles sold or published in the various periods as indicated by the evidence follow:

*First*, sales of the cards with pumps mounted on them.

| | |
|---|---|
| Period before commencement of action and notice | 66,000 |
| Sales after the commencement of the suit and the giving of notice | 300–303,000 cards |
| Sales possibly infringing made after the service of the injunction | 28,815 |

Of the foregoing sales the portion of the sales that constituted sales of the

revised card would comprehend at least all of the sales after the date of the service of the injunction and some portion but not a major portion of the 300,000 or 303,000 cards sold in the period after notice and before service of the decree.

*Second,* catalogue sheets published. The number of catalogue sheets published in the sense of disseminated in the trade was as follows:

| | |
|---|---|
| Catalogue sheets appearing in the supplement to the 1965 catalogue | 25,000 |
| Catalogue sheets appearing in the 1967 catalogue | 15,000 |
| Catalogue sheets (revised form) for the 1968 catalogue | 25,000 |

*Third,* advertisements published in various trade publications.

# I
## SALES OF PUMPS MOUNTED ON CARDS

Plaintiff has marketed its pump on the same card since the date of original introduction during the year 1964 and has continuously sold it down to the present time, its sales being approximately as follows:

| | |
|---|---|
| 1964 | 65,000 |
| 1965 | 90,000 |
| 1966 | 85,000 |
| 1967 | 80,000 |
| 1968 (10 mos.) | 75,000 |

Defendant started to sell the pump mounted on cards in 1965 and defendant's total sales of the pumps mounted on cards have amounted to approximately 370,000 to 400,000 items. There were other substantially identical siphon pumps on the market mounted either on cards or inserted in pliofilm sacks attached to cardboard headers. All of the pumps shown in the evidence were intended and packaged for sale in a self-service store or department where the siphon pump and card would be directly exposed for sale on a peg board or rack from which the prospective customer could select the card. No novelty attends the construction of the pump and plaintiff's copyright does not give it an exclusive right to sell such pumps on display cards that depict attractively uses to which the pump can be put. The article is simply a siphon hose and a squeeze pump protected by valves so that it can pump liquid from a lower level to a higher level, and, if an ordinary siphoning from a high level to a low level is to be carried out, then the pump feature functions to start the flow of water, relieving the user of the at times unpleasant task of starting the flow by sucking on an end of the siphon line.

The case involves neither a novel article nor a novel method of merchandising it. The copyright infringement is not an infringement of anything which is itself bought for its copyrighted content, as is an original book or picture. The infringement is not an infringement of *anything which creates product marketability,* nor does the copyrighted matter confer marketability on the product by reason of the particular depictions and descriptive material which the plaintiff employed and the defendant so abjectly copied. The instructions and pictures on plaintiff's card which the defendant so slavishly copied did not in their unique aspect have anything in particular to do with the intrinsic saleability of the article or with the actual sales of the article. The function of the instructions and pictures could fully as adequately have been supplied by totally different and totally non-infringing pictures and instructions. It is not claimed and the evidence does not warrant a finding that the copyright material rose above adequacy to the occasion and function of such material. A boundless range of equally adequate noninfringing instructions and depictions existed. The defendants' infringement was thus utterly gratuitous and abject in its unimaginative copying.

The evidence explored fairly, fully and from several different points of view the method of selling implicit in the articles of the plaintiff and defendant. Broadly, both companies appeal to an "impulse

buying" market. Broadly, both sell to stores which sell automotive and allied lines of product, to discount stores which have departments in them in which automotive, houseware, and hardware products are exposed for sale. Both sell to certain department stores which maintain departments in which housewares, automotive or semi-automotive and home furnishing articles are exposed for sale.

There are differences in the clientele which the two companies serve. Fedtro is a larger company with a very much larger catalogue and with a much more extensive commitment to electrico-mechanical and electronic equipment. There is, however, no doubt whatever under the evidence that plaintiff and defendant were in direct competition with each other in the sale of the pump.

Both companies have very long customer lists and sell both directly to retail outlets (often chain store or other multi-units) and indirectly through jobbers and wholesalers who in turn sell to retail stores of various kinds. Certain of the stores which are the ultimate customers of both can be cross-classified as mass marketers of the familiar "discount store" variety although that elastic definition can embrace such an organization as Korvette which, in certain of its stores, would be considered a mass marketer or discount store, and, in other stores and department stores, would be considered as more nearly conforming to a department store of sorts.

Wherever the rival pumps are sold they are sold as display items, and sales depend on stimulating the interest of buyers on sight. They are presented to the buyer's eye by being hung from a hook in a peg board, or from a rack, or in some other direct display area. They are not shelf items. The evidence warrants the conclusion that there is a recognized class of merchandise sold as impulse-buying items and that the articles of plaintiff and defendant are in that class, and intended to stimulate purchase through the bare appearance of the article and its presentation to a prospective buyer of a comprehensible idea about its uses. The

evidence warrants the conclusion that, among people interested in classifying articles in terms of their marketing characteristics, impulse-buying articles belong to one of two broad categories, those which do not have to introduce themselves and their utility to the average buyer, but simply present themselves to his eye and remind him of their utility and his need; the second type of impulse-buying item is one which is unfamiliar to the generality of buyers and which therefore must through its display package do three things: first, attract the buyer's attention by the appearance of the card and the article, then, interest the buyer in learning about the function of the article, and finally relate the function practically to the buyer's conditions of life. It must, that is, not only explain itself and its utility but persuade the buyer that its utility has direct application to him by illustrating a contingency which the buyer can visualize as likely to arise in his own experience.

The evidence warrants the conclusion that the articles of plaintiff and of defendant perform the task of attracting the eye, explaining the utility of the article and relating it to possible life situations of prospective purchasers, and that both of them do it more attractively and comprehensibly than for example the Porta-Pump, Exhibit F, which is essentially the same article in a pliofilm bag which is suspended from a "header" card perforated for hanging on a peg board, or rack. But it is apparent that there is no really sharp distinction between articles so familiar that the impulse they stimulate is essentially an impulse founded in recognition and remembrance of need as distinguished from a wholly distinct class in which the article is unfamiliar and its display must explain its purpose and cannot rely on being a mere reminder. The pumps in question would appear to fall in a middle class of being an article familiar to many but not so very generally familiar that it can be assumed that the generality of customers would know at a glance what a siphon

pump was when one was clearly exposed to view (as is the Porta-Pump), and, hence, that it was sensible merchandising to display an explanation of the pump's uses, and to illustrate how it functioned, and how it might be useful to the buyer in his life situation.

The evidence warrants the conclusion that in sales of siphon pumps of the kind common to plaintiff's and defendants' marketing efforts such a display card as plaintiff used and defendants copied is an integral and useful part of the marketing mechanism and that such display cards as the defendants copied from the plaintiff are superior to such a merchandising device as the Porta-Pump pliofilm sack and header card. There is no value distinction between the card used by plaintiff and the various display cards used by other pump vendors which perform substantially the same role that the card common to plaintiff and defendants perform.

As noted above, both plaintiff and defendant have relatively large numbers of customers and also a remarkably large number of products. The companies both sell on a nationwide basis, but the evidence is not clear about the extent to which their customer-spread over the country is approximately the same in intensity of sales saturation area by area. Plaintiff had about 7,300 customers, the defendant had about 1,500 customers. Defendant sold its pump to about 425 of its customers.

Plaintiff and defendant had in common probably 700 customers more or less (based on a fairly satisfactory sampling comparison). From the sample it was inferred that about ten percent of plaintiff's customers were also customers of defendant and that they constituted very nearly fifty percent of defendant's customers. Analysis showed that 179 of the 281 common customers in the sample had bought defendant's pump and that only 59 of the customers common to plaintiff and defendant had bought pumps from both firms at one or another time (purchases from plaintiff occurring as early as January 11, 1964).

Analysis of these 59 customers' purchases was carried the further step of ascertaining from plaintiff's records the dates when that common pump-customer had made his first pump purchase from plaintiff and it was determined that first-purchases were scattered over the entire period. There is no evidence, however, of the whole number of its customers to which plaintiff sells its pump, nor of the number of sampled common customers to whom plaintiff sells its pump to the exclusion of defendants.

There is here, then, very direct evidence that plaintiff and defendants were selling substantially the same product, to the same customers and were trying to sell it to other common customers and were meeting with indifferent success. Assuming that the sample fairly represents the whole competitive picture, no valid inference can be drawn from it about the extent to which defendants gained sales at plaintiff's expense, or gained an entree and sales by means of the imitative aspects of the card. The failure more completely to disclose the detail of plaintiff's separate sales experience, its poor representation despite its head start of over a year, and the absence of specific evidence of sales shift due to the card's imitativeness preclude any such inference as that plaintiff would have made about 30% of defendants' sales but for the infringement.

The two articles were not offered at the same price. Plaintiff offered the article in general at eighty-nine cents. (It also had a higher price which appears not to have been significant.) Defendant's price was sixty cents or under. It had a nominal jobber price of eighty cents which appears not to have been often used, although some sales at 72¢ (which may be the jobber price less 10%) appear among its sales, and various other prices were used. But in general defendant sold the article for sixty cents or less and averaged on some $205,000. of sales a little over 55¢.

There is evidence that warrants the conclusion that such an article as the siphon-pump can be retailed for as much

as $1.69 and as little as ninety-nine cents in various sorts of stores. Generally plaintiff's retail prices ranged around $1.69 and the defendant's article generally sold for somewhat less, although there was in evidence an article bought in a Korvette store for $1.59 as well as indications of sales of defendant's pump at ninety-nine cents and at around $1.29. The evidence warrants a limited conclusion that there are gadget buyers in some number to whom a price difference as great as 50¢ in the case of an impulse-gadget selling between $1.00 and $2.00 will not determine whether they will buy or reject. The evidence does not, however, warrant the conclusion that the price to the retailer is not important in the retailer's determination of which of two items he will stock when he is ready to decide that he will carry such an item. The preponderance of the credible evidence is that the buyer if he perceives no basic sales inferiority in one of two articles offered to him similar to those of plaintiff and defendant will buy the less expensive article and re-offer it at precisely the highest point between a dollar and two dollars at which the impulse buyer is likely to buy.

The retail store could find differences between plaintiff's and defendant's articles. The plaintiff's article is not enclosed in a pliofilm wrap, but it is of dark contrasting colors, and it would offer the mixed advantage-disadvantage of enabling the customer to handle it and get the feel of the way it worked. Defendant's article is enclosed in an overall pliofilm cover which makes it more difficult to get the feel of the article. However, the plaintiff's article, because it is exposed, presents some housekeeping problems, accumulating dust and a used look if it does not move out quickly, and it conceivably presents risk of wastage and a slightly enhanced susceptibility to pilferage. The defendant's article would present less of a housekeeping problem, and it would be somewhat more difficult to steal. However, the merchandising distinctions between the two articles are overwhelmed by their essential identity as packages that would satisfy the same retailer needs and in general stimulate approximately the same customer impulse in the same degree.

■ Necessarily the presence of defendant's article and other manufacturers' articles in the market affected plaintiff's sales, and the evidence affords no ground for inferring that plaintiff's flattening sales curve was due to anything other than its high costs, stern competition, different customer list and different sales emphasis. Defendants' activities can certainly not account for plaintiff's poor overall success when defendants sells to less than ten percent of plaintiff's customers. Plaintiff's contention that defendants sales represented not merely infringements the profits from which it is entitled to claim but also represented sales lost to the plaintiff through the infringement and that the infringement occasioned the loss to plaintiff of the whole profit-value of the unmade sales as measured by plaintiff's own profits on such sales, is not supported by its proofs. Of course, in any event if the defendant's unit profit on the infringement aspect of each transaction in which it engaged is a certain amount and the plaintiff's profit on the same sale, if it had made such sale, would have been a greater unit amount, plaintiff would not be entitled to both recoveries but only to the greater of the two recoveries, notwithstanding the language of Section 101(b), and the settled rule that the first two clauses of Section 101(b) are cumulative. Damages from infringement can take many forms but when the damages from infringement take the form of claiming the entire profit on the defendant's sale, on the lost-sale-to-plaintiff theory, the amount so claimed is inclusive of both damages and profits under the cumulative language of Section 101(b). The difficult question here is whether there is any substantial foundation for the conclusion that part of the plaintiff's damages from infringement consisted in a loss of sales to defendant or a diversion of sales to defendant.

There are two carded siphon pumps which are currently being offered for sale, one put up by Hollywood Accessories and the other put up by a firm identified as "Oxwall," Exhibit B. No action has been commenced against either of these companies and their items are not regarded as infringing items. There had been a carded item offered by Westwood and that item was a slavish copy of plaintiff's article, Exhibit 2, and after Westwood was sued by plaintiff it discontinued the product altogether, not simply discontinung the use of the allegedly infringing card. In addition Hitest-Premium, a distributor to whom defendant sold its carded product, sold pumps which were direct infringements in exactly the same sense as plaintiff's Exhibits 3 and 4 of which the Hitest-Premium product was simply a distributor examplar. An infringement action is pending against Hitest-Premium in the Southern District of New York and the figures used in the present case are evidently inclusive of defendant's sales to Hitest-Premium.

■ The evidence does not warrant any inference that defendant's copyright infringement was the proximate cause of plaintiff's losses of sales to defendant and to others. Plaintiff's price of eighty-nine cents was in the significant trade paths substantially in excess of plaintiff's selling list price of sixty cents and actual sale price of an average of around fifty-five cents. With that differential in price, which the evidence warrants concluding was the dominant difference between the two articles in their trade successes, there is no reason to doubt that defendant's article would have commanded a substantial share of the market whether presented on a display card or in a sack under a header. It is speculation to seek to locate some measurable quantum of sales diversion that can fairly be traced to the use of the copyright material on the card rather than to other marketability factors.

■ The marked price advantage was such that the retailer was free to pass it along to his customer or to retain a wider profit pretty much on his own option and in terms of his judgment of the effect that price trimming might have on the velocity of sales, for there is no marked disparity, if any, in the quality appearance of the two articles. Defendant's article was made in the United States, and could be presented as an American made article thus capitalizing on any xenophobia that disclosure of the Japanese origin of plaintiff's product might evoke. Defendant's article was of translucent plastic and a half foot longer than plaintiff's. The translucent plastic of defendant's pump enabled the interested customer to see the structure and visualize the functioning of the pump better than plaintiff's opaque article. Plaintiff's article was less likely to get shopworn quickly. Defendant had an established business and had other siphon pumps in its line including a foot-operated model; it had a basic clientele for articles of the kind involved in the present litigation, and it expectably commaded a share in a market for siphon pumps if it presented such a pump in an appropriate merchandiser-package. The test figures indicate that 179 common customers out of 281 bought pumps from defendants, and if that ratio had prevailed in defendants' whole list of customers, about 955 would have been pump buyers. Instead, of defendants' entire customers list it appears that only about 425, or about 28 percent of its customers, bought defendants' pumps. There is no evidence that the remaining customers were not pump buyers who bought pumps from neither party. The sample indicates that plaintiff, selling to only about half of defendants' customers, sold its pumps to about a third of defendants' pump customers, and to not less than about 21% of all the indicated common customers. Since there is no evidence of how many of defendants' customers bought plaintiff's pumps to the exclusion of defendants' pump, and no indication of the number of plaintiff's own pump customers who bought its pump to the exclusion of defendants' pump, and no indication of the volume of

sales represented by the imperfect evidence of sales to numbers of customers, there is no evidentiary or statistical basis for an inference of diversion of sales. While defendant may have taken customers from the plaintiff, and *vice versa,* the evidence does not suffice to warrant a finding that the use of the infringing copyrighted material proximately caused any measurable diversion of customers. The inferences are that defendants obtained business from their own regular customer list, and that, if they took business from plaintiff on the siphon pump it was by reason of nothing other than their offering an adequate self-service merchandiser package of the same general type as plaintiff's and with about the same retail sales value at a drastically lower price.

■ The evidence does not completely indicate plaintiff's unit profit on its own sales of its own pumps. However, the evidence is that at an eighty-nine cent price plaintiff's gross profit would have averaged 44.4 cents less a half cent for shipping supplies and salaries, or 43.9 cents, or 49.3% profit; prorating adjusted overheads (net of sales commissions) of 22.3% would have yielded a net profit percentage of 26.7% or 23.76 cents a unit on sales of the pump as mounted on the card. Since, however, it does not appear that plaintiff has shown that the imitativeness of defendants' card was the efficient agent of a diversion of business which would otherwise have accrued to plaintiff, the profit computation on "lost sales" becomes immaterial. Plaintiff's copyright gave it no right to be free of defendants' competition, but only the right, at best, to be free of any loss of sales that could fairly be attributed to the imitativeness of defendants' card in its pictorial and verbal (not its structural or its functional) features.

■ Defendant must account for the profits that it derived from its egregious persistence in the use of the infringing material. Plaintiff argues that the profits made from the infringement, since defendants confused infringing and non-infringing materials and presented a problem of apportionment that cannot be solved, can be determined at one-half of the whole of the profits realized on the defendants' infringing sales. Granting that under Section 101(b) plaintiff need only show sales and defendants must "prove every element of cost which he claims" what is the sale which the plaintiff must show? It is the sale of the copyright material that the plaintiff is, as it were, prima facie entitled to stand on, and it is the costs of that sale of the copyright material which the defendant has the burden of establishing. Hence, the basic question becomes, here, What can be said to be the sales price of the copyright material? And, when that has been ascertained, what are the costs relevant to it? No doubt the tort feasor must submit to any crudeness of result that follows if precise determinations cannot be made. Sheldon v. Metro-Goldwyn Pictures Corporation, 1940, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825, is, however, clear that it is only the profit on the infringing material that plaintiff may recover. That defendants cannot separate out exactly the profits certainly apportionable to the copyright material does not mean that the entire sales value less costs, or even one-half of it, goes over to the copyright owner where manifestly much quite separate from the copyright material has passed in the sales involved; that was *Sheldon,* where the successful motion picture included many money-making elements along with a script that infringed the copyright on plaintiffs' play. Orgel v. Clark Boardman Co., 2d Cir. 1962, 301 F.2d 119, brings that out equally sharply. The propriety, too, of making allowance for overhead costs is explicitly recognized in Neal v. Thomas Organ Co., S.D.Cal. 1965, 241 F.Supp. 1020.

One approach here would be to recognize separately the sales value of the product and the functional value of the infringing use of the card. The infringing card is not a product sold to the consumer as such, but it is something that functions, to use an expression em-

ployed by more than one witness in the case, as a "silent salesman" of the product. The card is not the only sales stimulant, for the product must to some extent sell itself if it has recognizable visibility in the store. If not visible, the product may still have a class or individual good will arising out of the known utility of the article, or such articles, which assures some demand for it.

But broadly, the card functions to effect a sale much as a demonstrator or a salesman would aggressively make a sale. To an extent any salesman, silent or living, will do to effect some level of sale for a simple product. That is a relevant consideration here, where no specifiable sales excellence in the copyrighted material promoted extraordinary product sales. The significant thing was not the brilliance with which the copyright material exploited the medium but the fact that the product was presented on a merchandiser which adequately pointed out and illustrated uses of the product. All was in the public domain except the particular pedestrian word choices, and dully explicit line drawings, which fulfilled an exploitable role with routine adequacy.

To allocate on a fair basis among the components of the card the service reward that fairly belongs to the card as a good-enough merchandiser which also contains copyright material would itself present another difficult allocation problem, since the use of merchandiser cards is in the public domain. Defendant suggests that it ought to be treated as making a profit on the card (taking each card at its 4¢ cost) measured by the overall average net profit it makes on every dollar of its product costs generally speaking. On defendant's figures, averaged over the years 1965 through 1968, that is 1.28 cents for each infringing card, a very small figure compared to one-half of the entire profit, or 12.46¢ a card, which plaintiff computes as the defendant's profit on infringing sales of cards. But there is another way of looking at defendant's theory. Defendants' direct material costs for pump and card combined were 18.1 cents of which the card represented four cents. If defendants were right about the relevancy of raw product cost, then consistency of theory requires that they trace through the profit on pump-and-card costs.

Defendants' card costs represented 22.-1% of its direct material costs for card and pump combined; if each dollar of material cost generates the same share of the final net profit (after labor and overhead are allocated in the same ratio as material costs) the card would have produced 22.1% of the product profit. Plaintiff computes a profit of 24.92¢ on each mounted card, and 22.1% of that would equal 5.5¢ of profit allocable to each card. On defendants' very different method of computing—applying an overall profit percentage of 16.667% to constructive sales value—a recomputation to distribute a computed profit of 9.205¢ to each sale of a pump and card at an average price of 55.23¢, and then to distribute 22.1% of that profit to the card would produce a profit on the card of 2.03¢. (The discrepancy in the two sets of figures arises mainly from plaintiff's computing defendants' net profit at over 41.5% of a sales value of 60¢, by treating 18.1¢ as being all of defendants' relevant costs.)

Do any of the figures, 12.46¢ or 5.5¢ or 2.03¢ or 1.28¢ fairly measure the value of the service function of the card? Plaintiff's profit figures seem very high, but there is validity in its contention that defendants failed to show the particular direct material costs of the pump and card other than the stated cost of the pump, at a surprizingly small 14.1¢, as given in the answers to the interrogatories, and the 4¢ card cost as indicated by invoices. Defendants cannot insist on the use of the average figures for all products, for the pump could be a high profit item. Defendants' figure of 1.28¢ a card profit must be rejected both as an allocated profit figure on the card and as fairly reflecting the value of the service function of the card. So too must the figure of 2.03¢, which, again, as-

sumes that the profit on the pump and card combined was average.

Plaintiff's figures are too high, *first,* in using 476,310 units sold as the base rather than 400,000 units sold, and, *second,* in using 60¢ as a unit sales value rather than 55.23¢, the average sales value derived from 370,000 sales. The total sales value of infringing cards and pumps was $220,920. Applying the overall labor costs percentage of 22.76% of reported total costs of sales other than labor to the 18.1¢ of material cost on the pump and card to bring its costs up to average costs, produces an average cost of sales of 22.22¢ on the pump and card (18.1 + 4.12). Total cost of sales would then be $88,880. If overhead is applied in proportion to cost of sales, then the pump and card cost of sales, as 3.26% of total cost of sales of $2,724,000, bear overhead equal to $51,508 ($158,000 x 3.26%). The total applied costs ($88,880 + $51,508) of $140,388. amount to 35.10¢ a unit, which, subtracted from the average sales value of 55.23¢, indicate a unit net profit of 20.13¢. If 22.1% of the profit is assigned to the card, that would be 4.45¢ profit treated as earned by each card.

Such a profit allocation is supportable if the card is considered as sold to the retailer in the same sense as the pump. If considered as a sales aid provided for a functional purpose the value of which is better measured in terms of its sales service, the figure is supportable by some analogy to commission rates of 5 to 10 percent variously figured at wholesaler and retailer levels. But on either alternative, and on both, the whole profit of the card is not due to the infringing material. At this point, however, the elements of defendants' responsibility for the confusion of values, the nature of the infringement, and the incompleteness of defendants' showing on accounting data require resolution of all final uncertainties against defendants. Two-thirds of the computed unit profit of 4.45¢ ascribed to the use of the infringing cards, or 3¢ a card, must be ascribed to the infringement.

■ The gravest aspect of the case turns on defendants' conduct during the litigation and after entry of the injunction and its service on the defendants. It became increasingly evident that defendants had not disclosed to their own counsel the facts about the steps taken to abandon the infringing cards, store those which had no pumps mounted on them, and dispose of the remainder, some indeterminate number of which had pumps mounted on them and others of which, it seems, were in, or put in, that condition after the service of the injunction. Testimony was given that was either superficial, ill-informed and careless to an extraordinary degree, or consciously perjurious. When radically suspicious evidence began to emerge, defense counsel (and there had been a substitution between the infringement and damage trials) saw to the completest disclosure and, without abandoning his client, sought both to elicit all the facts and to limit the damaging evidentiary inferences compelled by the development of the evidence.

The evidence requires the conclusion that by design or inexcusable failure to take required action a substantial number of infringing cards were used after the date of service of the injunction. The evidence does not, however, suffice to fix the number with confidence.

Much evidence in the last phase of the damage trial at first made it appear that almost certainly defendants had callously used 27,206 cards from a February 26, 1968, Contract No. 5632 of defendants with Pioneer Paper Corporation, their card supplier; these appeared necessarily to have been infringing cards, and it seemed at first clear that no noninfringing cards were available until about June 19, 1968. However, it was ultimately shown, although not beyond peradventure, that new cards were available soon after April 29, and as early, apparently, as May 1, 1968. It was not, however, shown that the entire stock of old cards was either stored or destroyed. To the end a discrepancy persisted that requires the conclusions (a) that sub-

stantially more infringing cards were used than the 370,323 for which defendants were able specifically to account, and (b) that a substantial number of infringing cards were culpably used after the injunction was served. Unaccounted-for sales, almost certainly, were not in the order of 100,000, as plaintiff argues, despite the failure to account of record for apparent deliveries of cards in that number, and the final state of the evidence does not fairly support an inference that over 28,000 infringing cards were used after the injunction was served. Since the genuine uncertainties that persist arise out of defendants' misconduct first as tort feasor and then as party-litigant, there is no fair ground for limiting the recovery to the number of sales admitted and demonstrably established from the records defendants produced; the figure of 400,000 infringing uses of cards is the nearest estimate, allowing for substantial errors in reporting sales and a substantial overrun after April 29, 1968, that can be formed, and it is found to be the number of infringing uses for which defendants must account.

The basic profits which defendants made from the infringement through use of the display cards are therefore $12,000.

In addition, defendants sold and delivered to Sears Roebuck & Co., after the final injunction had been served, the plates from which the infringing Sears cards had been made (for $200, cf. 17 U.S.C. § 101(d)), and charged Sears 6¢ a card for 16,408 unused Sears cards on hand (defendants also charged Sears 6¢ each for nearly 23,000 nonexistent cards). Defendants have not shown the salvage value of the plates, and must account for them, therefore, at what they received for them, and they must, in the circumstances, account for the gross amount received for the infringing cards that they had on hand and for which they had the power but not the right to levy an illicit tribute (cf. Reading v. Attorney-General, [1951] A.C. 507). Plaintiff

is entitled to recover for the Sears infringement $1,184.48.

Defendants use of infringing matter in its catalogues and catalogue sheets presents the infringement in a different aspect. The very large printings supported the profitable dispositions of the pumps, and for the profits of that infringement defendants are required to account as set forth above. The printing and circulation were definitely infringements and in very considerable part, and possibly in major part, were infringements continued after notice. Since the infringements are distinct and additional, and, since they did not directly result in a measurable profit, it is appropriate to award in lieu of actual damages and profits the amount of $1,220. under Section 101(b), Second, which is at the rate of two cents for each page of infringing copy.

The six advertisements like the catalog material, do not reflect the existence of any profits from infringement other than those for which defendants are required to account by reason of the sales of pumps. The advertisements were not conspicuous and do not substantially exploit the infringing material. They appear to have had little sales significance. Damages under Section 101(b), Second, at the minimum rate are appropriate. Two of the advertisements were distinct and self-complete infringements, the four remaining advertisements, three in successive issues of the same publication, are to be considered as two infringements. See Westerman Co. v. Dispatch Printing Co., 1919, 249 U.S. 100, 105–106, 39 S.Ct. 194, 63 L.Ed. 499; Davis v. E. I. DuPont de Nemours & Co., S.D.N.Y.1966, 249 F.Supp. 329, 336–338. Accordingly the damages for the advertisements are $1,000.

The aggregate award, then, is $15,404.48.

■ Counsel fees present an extraordinarily difficult problem. There was initially some ground to resist the claim on the notion that the matter pirated

could not satisfy minimum standards of originality meriting copyright protection. But the case itself, apart from that, presented no difficulty and if defendants had responded appropriately to their role as litigants, and with any discretion in their role as actors in the business community, the case would have been and ought to have been modest in every dimension; defendants did neither: they responded to their role as litigants with repeated lapses from expected standards of ethical conduct, and to their role as business actors by paltering with the choice whether to abandon their copying or stand on the point of principle—their right to copy with impunity what was scarcely worth the cost-saving effected through copying. On the other hand it has at all times been evident that the damage—profit amounts involved, put at their highest were necessarily modest and could not, in a sound business appraisal, justify a large investment.

There is no doubt that the legal effort on plaintiff's side was extensive, skillful and, viewed as a professional effort, worth a great deal more than will be awarded. But one relevant and material criterion is the reasonableness of the expenditure of legal effort in terms of the monetary importance and difficulty of the case. In this case, a fee reasonable by that standard must be materially increased to compensate for the needless difficulties introduced into the case by the defendants' misconduct during the litigation. Plaintiff is awarded counsel fees of $10,000 pursuant to 17 U.S.C. § 116. The matter of including in the award of costs the disbursement amounts shown in Exhibit D on the motion is disposed of by the allowance of the following as taxable disbursements, notwithstanding that the transcript charges are, in whole or part, at daily rates:

| | |
|---|---|
| Infringement Trial transcript | $ 280.00 |
| Damages Trial transcript | 1655.75 |
| Pere deposition | 63.80 |
| Kraver deposition | 25.00 |
| Witness fees and travel | 81.01 |

The "Docket Fee in Court of Appeals" cannot be made taxable by any order of the District Court.

In the circumstances of this case discretionary interest at the rate of 6% per annum to the date of judgment is awarded on the amount of $15,404.48 from the estimated midpoint date of November 1, 1966.

Accordingly, it is

Ordered that the Clerk enter judgment that plaintiff recover of the defendants and each of them jointly and severally the sum of $15,404.48 plus interest thereon from November 1, 1966, to the date of judgment at the rate of 6 percent per annum plus $10,000, together with costs as taxed by the Clerk, the whole amount of such judgment to bear interest as provided by law; and it is further

Ordered that in taxing costs, the Clerk allow as taxable disbursements the amounts hereinabove allowed.