FITZGERALD PUBLISHING CO., INC., Plaintiff,

v.

BAYLOR PUBLISHING CO., INC., Bill R. Baylor, World Color Press, Inc., and Baylor Publishing Co., and Community Enterprises, Inc., Defendants.

No. 84–CV–2482.

United States District Court, E.D. New York.

Sept. 10, 1987.

R. Franklin Brown, New York City, for plaintiff.

Edwin Akers, Jr., Gallop, Johnson & Newman, St. Louis, Mo., for defendants.

## MEMORANDUM–DECISION and ORDER

BARTELS, District Judge.

This case has been remanded by the United States Court of Appeals for the Second Circuit for recalculation of damages issues. *See Fitzgerald Publishing Co., Inc. v. Baylor Publishing Co., et al.,* 807 F.2d 1110 (2d Cir.1986) (slip op.). The Circuit Court affirmed a judgment entered on April 4, 1986 in the Eastern District of New York (Weinstein, C.J.) finding for plaintiff against defendants Baylor Publishing Co., Inc., *et al.* (hereafter "Baylor") and World Color Press, Inc. (hereafter "WCP"), but reversed the trial court's findings regarding statutory and actual damages under 17 U.S.C. § 101, *et seq.,* caused by the infringement of plaintiff's copyrights. The Court of Appeals ruled that Baylor and WCP were jointly and severally liable for statutory damages and that the trial court incorrectly awarded actual damages on a theory appropriate for breach of contract, but not for copyright infringement. At 1111. On remand, this Court was ordered to recalculate the statutory damages to reflect a single award against both Baylor and WCP and to determine actual damages to be assessed against WCP. *Id.* at 1119. The Second Circuit affirmed the trial court's conclusion that both WCP and Baylor willfully infringed the copyrights. *Id.* at 1114–1116.

The remanded proceeding held by this Court on April 6–7, 1987 was intended solely to supplement the facts of this case as previously determined by Judge Weinstein at the original trial and relied upon by the Second Circuit in reaching its conclusions. Those findings constitute the law of the case, and accordingly, a brief restatement of prior findings is in order.

Fitzgerald Publishing Company is the copyright holder and publisher of the *Golden Legacy Illustrated Magazine,* and Bertram A. Fitzgerald is its president and sole stockholder. *Golden Legacy* treats the history of prominent black people in a comic book format. Each *Golden Legacy* set includes 16 volumes. In September 1983, when the copyright infringement at issue

first occurred, Fitzgerald Publishing had registered the copyrights for the set's first eleven volumes; however copyrights for the last five volumes were not registered until February 1984.

Fitzgerald Publishing has employed various printers to produce the *Golden Legacy* series. Defendant WCP printed the series from 1974 to 1980. A dispute over the quality of a printing job ended their business relationship in 1980. When Fitzgerald refused to pay the approximately $8000 printing bill from the disputed job, WCP retained possession of the *Golden Legacy* printing plates.

Soon afterward, Baylor contacted Bertram Fitzgerald and sought to reprint the *Golden Legacy* series. The two men negotiated terms sporadically from March 1982 to January 28, 1983, when Baylor and Fitzgerald entered into a contract. Under its terms, Baylor agreed, in return for receiving approximately 100,000 sets, to provide the "finances, materials, and labor" to reprint 142,857 sets of *Golden Legacy*. For "authorizing the reprinting of Golden Legacy" Fitzgerald was to receive the remaining sets. Baylor also agreed to pay Fitzgerald's outstanding debt to WCP, so that WCP would do the reprinting provided for in the contract. The contract did not transfer the copyright itself to Baylor. Further, as a condition precedent, Baylor was obligated to begin printing *Golden Legacy* by March 28, 1983 in order to retain his rights under the contract. Baylor also obtained an option to reprint again if Fitzgerald were paid $3000 : $2000 on the date of the contract and a promissary note for the balance. Baylor provided the promissary note, but when he did not pay on the note after a period of time, Fitzgerald terminated the option to reprint on February 24, 1983.

Baylor's failure to provide the promised financing for the initial reprinting of *Golden Legacy* prompted Fitzgerald to terminate the entire contract in April 1983. Although the Baylor–Fitzgerald contract clearly contemplated that WCP would do the reprinting, Fitzgerald did not contact WCP after ending his agreement with Baylor.

Baylor never reported his problems with Fitzgerald to WCP either, and continued to make arrangements for the reprinting as though nothing were wrong. Consequently, WCP had no actual knowledge from either party that the Baylor–Fitzgerald contract had been terminated. On March 17, 1983, Baylor directed WCP to change the copyright notice on the *Golden Legacy* plates, although Fitzgerald never gave his permission in the contract for a change of notice. WCP did not receive a copy of the Baylor–Fitzgerald contract until March 22, 1983, and neglected to submit it to counsel for review prior to changing the copyright notice. WCP performed some preparatory steps for the reprinting in mid-March 1983, so that Baylor could inform Fitzgerald that the initial stages of printing had begun, as required by their contract. *Golden Legacy* was not actually printed until September 1984, because Baylor was unable to obtain sufficient funds to make the advance payment required by WCP for printing costs. Fitzgerald first learned of *Golden Legacy*'s republication in January 1984 and immediately contacted WCP to complain about the change in copyright notice.

Judge Weinstein also made two other relevant findings that were addressed in the Second Circuit's opinion. First, the district court found that Baylor had defrauded WCP as well as Fitzgerald, thereby causing WCP a substantial financial loss on its contract with Baylor for the reprinting. A customer statement from WCP to Baylor, dated Jan. 11, 1984, clearly establishes the basis for this ruling. Plaintiff Exhibit 95. WCP provided $91,204.38 in services to Baylor, but only received $36,264 in advance payments for its labor. No other payments were ever made, and WCP sued Baylor in Washington state court for the delinquent $54,940.38. Plaintiff Exhibit 101 (Complaint for Goods Sold and Services Rendered).

Second, Judge Weinstein also determined that Fitzgerald had produced no evidence indicating that he would have or could have reprinted *Golden Legacy* himself were it

not for the contract signed with Baylor. Transcript of Hearing, before Weinstein, C.J., February 13, 1986, at A27–28 (Findings of Fact and Conclusions of Law). The Second Circuit inferred that Fitzgerald produced no evidence that he was marketing Golden Legacy during that period by contacting distributors or other potential customers. At 1118. It therefore concluded that Fitzgerald was not in direct competition with the infringing copies of *Golden Legacy* during that time period. The Second Circuit did instruct that on remand Fitzgerald's past sales and marketing efforts should be considered in determining actual damages. *Id.* at 1119.

At this trial on April 6–7, 1987, the Court heard testimony on damages from (1) plaintiff's witness Daina Bennett, who sold *Golden Legacy* for Baylor during 1984–1985, (2) plaintiff Bertram Fitzgerald, and (3) plaintiff's witness Una G. Mulzac, owner of the Liberation Bookstore. Both plaintiff and defendant WCP introduced substantial documentary evidence at the original trial, which the Court has also considered. Defendant WCP did not call any witnesses and relies solely on its cross-examination of plaintiff's witnesses and its evidence at the original trial. Accordingly, the Court makes the following findings of fact and conclusions of law.

*Findings of Fact*

1. Daina Bennett became employed by defendant Bill Baylor in May 1984 as a marketing sales representative in charge of marketing *Golden Legacy*. At that time, Baylor took her to a warehouse in Kent, Washington, where she saw three stalls, each about the size of a trailer, which were each half-filled with copies of *Golden Legacy*. Baylor told her that the stalls were full when he first received inventory and showed her a series of purchase orders from WCP which indicated that 47,000 copies of each volume of the *Golden Legacy* set had been printed.

2. Based on this testimony, there is insufficient proof that Daina Bennett ever saw the entire shipment of *Golden Legacy* or that Baylor sold all copies of *Golden Legacy* which he received. She only saw a substantial portion of the shipment, and has recounted what Baylor told her about the remainder. During this litigation, it has become clear that any statement by Baylor is inherently suspect, and his statement cannot be accepted as true concerning the initial location of the whole shipment. Further, Bennett's memory about the shipment size is itself faulty. Defendant's Exhibit BBB clearly shows that deliveries for all volumes were 50,000 copies or more.

3. In January 1985 Baylor moved 4000 sets of *Golden Legacy* to Bennett's garage. 3000 sets were sold from her garage, but she could not testify concerning the revenue produced by these sales. It cannot be assumed that Baylor received the one dollar ($1) price on the magazine covers because Baylor apparently sold most of his copies at heavy discounts off the cover price.

4. Soon afterward, Bennett left Baylor's employ and refused to return 1000 sets of *Golden Legacy* remaining in her garage, because Baylor would not pay her commissions on previous sales of *Golden Legacy*. In December 1985 Bennett began to solicit orders for *Golden Legacy* on behalf of Bertram Fitzgerald, the plaintiff, and continues in this capacity to date. Bennett did not destroy these infringing copies of *Golden Legacy* in her garage, despite knowledge of an injunction ordering destruction of the copies. Bennett suspected that Baylor had no legal right to sell or reprint the books as early as May 1984, and she undeniably learned about the injunction in early 1985 from Fitzgerald himself.

5. Bennett performed marketing for Baylor by mail order advertising, telephone solicitation, and church fundraisers. Advertising was primarily sent to schools and libraries. Most of Bennett's sales for Baylor were to customers responding to these solicitations.

6. Bennett indicated that when she contacted book stores and vendors on behalf of Fitzgerald after December 1985, she found that these customers refused to purchase *Golden Legacy* because Baylor had already supplied them with their needs. Although

Bennett testified that she may obtain an order for Fitzgerald from the State of Washington for 1800 sets, no firm sale has been made yet. No other substantial orders were mentioned.

7. Bennett's testimony does establish that Baylor's infringing copies were being advertised and sold to the same general customers to whom Bertram Fitzgerald had sold in the past and seeks to serve in the present and future. Baylor's activities temporarily glutted the market with infringing copies of *Golden Legacy*, thereby foreclosing a potential short-term market for Fitzgerald.

8. Bertram A. Fitzgerald, Jr., first published *Golden Legacy* in 1966, and since then has printed approximately nine million copies of the magazine. WCP printed 3,350,000 copies of the series during the years 1974–1980. This averages out to approximately 550,000 copies per year.

9. In proceedings before Magistrate Chrein, Fitzgerald previously submitted an affidavit on September 12, 1985. In his affidavit Fitzgerald admits that he cannot provide sales records for the period 1966–1980, but indicates that every copy of *Golden Legacy* was sold less than one year after it was printed. (Affidavit at para. 7).

10. The affidavit indicates that corporate sponsors purchased large quantities of *Golden Legacy*, and other sales were made to bookstores and schools. Sales were often generated by direct responses to advertising. (Affadivit at para. 6)

11. Fitzgerald testified that in 1982 he had a small inventory of *Golden Legacy* remaining. He sought to reprint the series with WCP, which refused to do so until prior debts from the 1980 printing were paid. Fitzgerald had 3 corporate clients who wished to purchase the magazine at that time, and could not supply them unless WCP did printing for him.

12. Fitzgerald said that WCP had printed for him "with no money down" in 1980, when he refused to pay the full amount due. This refutes his contention that WCP controlled and encouraged Baylor by granting him preferential credit terms. Baylor's terms with WCP were not more favorable than those Fitzgerald had received on at least one occasion.

13. Fitzgerald sought to resupply himself in 1982 with inventory running low in order to serve corporate customers, his traditional client base. Due to his dispute with WCP, he required alternative means to print the *Golden Legacy*, and entered into the contract with Baylor on January 28, 1983, who agreed to pay his debt with WCP and supply fresh inventory. It must be emphasized that Fitzgerald took no steps to obtain a fresh supply of inventory for his clients after terminating his contract with Baylor, and still has not done so to date.

14. Fitzgerald's lack of records makes it impossible to estimate how much lost profit or revenue he may have suffered as a result of Baylor's sale of the infringing copies of *Golden Legacy*, even if the Court assumed that Fitzgerald could have sold all the copies provided by WCP to Baylor.

### Conclusions of Law

1. This is an action seeking damages pursuant to the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* and for unfair competition and breach of contract. Jurisdiction is authorized under 28 U.S.C. §§ 1331 and 1332. This case has been remanded to calculate the copyright damages only.

2. Plaintiff failed to register his copyrights for Volumes 12–16 before the infringements occurred and therefore is not entitled to statutory damages or attorney's fees for these volumes. 17 U.S.C. § 412(2). The plaintiff must prove actual damages attributable to the defendants' infringing activities.

4. The primary measure for the recovery of actual damages under 17 U.S.C. § 504(b) is the extent to which the market value of the copyrighted work at the time of infringement has been harmed or destroyed by the infringement. 3 *Nimmer on Copyright* § 14.02 at 14–6(1986). The best method available for measuring this diminution in market value is the profit lost by the plaintiff due to the infringements. *See, e.g., Big Seven Music Corp. v.*

*Lennon,* 554 F.2d 504 (2d Cir.1977); *Kenbrooke Fabrics, Inc. v. Holland Fabrics, Inc.,* 602 F.Supp. 151, 155 (S.D.N.Y.1984). Further, the profit lost by the plaintiff is not equivalent to the profit gained by the infringers, since the opposing parties will have different selling techniques and business organizations. *Fedtro, Inc. v. Kravex Mfg. Corp.,* 313 F.Supp. 990, 995 (E.D.N.Y. 1970). The plaintiff is entitled to his own lost profit, or the profit of the infringers, whichever is greater.

5. Magistrate Chrein previously reported that plaintiff produced evidence showing third party purchases from Baylor for 126 sets, amounting to $866.50 in revenue. Defendant Baylor then had the burden of proof to establish the costs allocable to these sales. *L & L White Metal Casting Corp. v. Joseph,* 387 F.Supp. 1349, 1358 (E.D.N.Y.1975). Baylor's failure to submit evidence of deductible expenses precluded any deductions, and the plaintiff is entitled to $866.50 in profits from Baylor.

6. Plaintiff has failed to show that Baylor sold all the copies of *Golden Legacy* delivered by WCP and has proven only that 3000 additional sets were sold for Baylor by Daina Bennett. Further, even for these 3000 sets no proof of gross revenue was presented. Accordingly, the Court cannot increase the plaintiff's actual damages due to Baylor's profit on these sales.

7. WCP made no profits from its infringement of the copyrights. Judge Weinstein correctly concluded that WCP itself was defrauded by Baylor and suffered substantial losses of $54,940.38. Under these circumstances the Court recognizes that Baylor's debt to WCP for the printing is uncollectible. *See Sammons v. Colonial Press,* 126 F.2d 341, 350 (1st Cir. 1942). Accordingly, plaintiff can recover no profits from WCP. Further, it is appropriate to note that WCP can be held jointly and severally liable only for actual and statutory damages, but not for any profits made by Baylor. *Abeshouse v. Ultragraphics, Inc.,* 754 F.2d 467, 472 (2d Cir. 1985)

8. In the present case, there is no evidence that plaintiff suffered any lost profits caused by the infringement itself. The plaintiff argued that every infringing copy received by Baylor is a sale lost to Fitzgerald, as in *RSO Records, Inc. v. Peri,* 596 F.Supp. 849 (S.D.N.Y.1984). The principle underlying *Peri* is inapplicable to this case because at trial the plaintiff failed to prove that Fitzgerald was in direct competition with Baylor or that Baylor sold all copies delivered to him. The Second Circuit permitted the plaintiff to offer new evidence on these issues on remand. *See* at 1118–1119.

The plaintiff's evidence is insufficient to alter the original findings made by Judge Weinstein. First, although Daina Bennett testified about Baylor's activities, she failed to show that Baylor sold all copies in his possession, and there was no evidence of his gross revenue. Second, although Fitzgerald testified that he had customers interested in making purchases of unspecified amounts, there is no indication that he could provide clients with the necessary magazines without the Baylor contract. He took no steps to obtain fresh supply after terminating that contract, either before or after he learned that Baylor was selling *Golden Legacy*. Accordingly, Fitzgerald has not been marketing the *Golden Legacy* series in any meaningful way since 1982. Based upon these facts, Fitzgerald has not proven any actual damages caused by the infringement of the copyright.

9. Even if the Court assumed that every infringing copy sold was a sale lost to Fitzgerald, the damages are too speculative to calculate. Fitzgerald produced no proof of Baylor's gross revenue. Although the plaintiff described his historic sales levels, he provided no evidence of his prior revenues or profits from the *Golden Legacy* series. In light of this lack of data, there is no feasible method available for estimating his damages. The Court requires credible evidence of the volume of diminished sales during or after the infringement, profit per unit sold, the actual prices received for the product by the plaintiff or the infringer, *inter alia,* as was

presented in *Big Seven Music Corp. v. Lennon*, 554 F.2d 504, 508–511 (2d Cir. 1977). When such evidence is unavailable, statutory damages are the appropriate basis for relief. *See Kenbrooke Fabrics, Inc. v. Holland Fabrics, Inc.*, 602 F.Supp. 151, 155 (S.D.N.Y.1984). Statutory damages are unfortunately unavailable to Fitzgerald for Volumes 12–16, since it failed to register its copyrights in time.

■ 10. The plaintiff is entitled to statutory damages for Volumes 1–11. Under the 1976 Copyright Act, the plaintiff has the right to a minimum of $250 and a maximum of $10,000 per infringement, according to what the Court in its discretion finds just and up to $50,000 per infringement if the copyright violation is willful. 17 U.S.C. § 504(c).

Undoubtedly these damages should bear some relation to the actual damages suffered; however, since statutory damages are often used in cases where actual damages are difficult to prove, they cannot correspond exactly with actual damages. Such is the case here, where Baylor's profits cannot be ascertained due to his failure to appear before this Court. Further, Congress has provided for greater awards which exceed actual damages for willful infringements "to serve the Copyright Act's twofold purpose of compensation and deterrence." *Peri, supra*, at 862; *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 592 F.2d 651, 657 (2d Cir.1978); *see also Milene Music, Inc. v. Gotauco*, 551 F.Supp. 1288, 1296 (D.R.I.1982) ("Courts have ... focused largely on the element of intent, and the per-infringement award tends understandably to escalate, in direct proportion to the blameworthiness of the infringing conduct.")

Several factors in particular are considered when setting the damages for willful infringements. In the present case Baylor has not appeared before this Court, and his absence contributed to the dearth of evidence available to the plaintiff. *Fallaci v. New Gazette Corp.*, 568 F.Supp. 1172 (S.D.N.Y.1983). Only Baylor knows the number of infringing copies actually sold and the gross revenue reaped by his enterprises. Further, the evidence has shown that *Golden Legacy* is sold to a very specific market, i.e., schools, libraries, bookstores specializing in black history, and selected corporate clients. Fitzgerald traditionally sold to this market, and Baylor's activities have impaired the plaintiff's ability to make future sales to his traditional client base. *Cf. Lauratex Textile Corp. v. Allton Knitting Mills*, 519 F.Supp. 730 (S.D.N.Y.1981) (direct solicitation of the plaintiff's best customers).

■ 11. WCP is not as culpable as Baylor in the damage done to the plaintiff; nevertheless, the Second Circuit expressly ruled it to be jointly and severally liable as a willful infringer. At 1115. There is a need to deter the type of error committed by WCP in altering a customer's copyright without consent, and because of this WCP cannot avoid responsibility for the more flagrant abuses of its co-defendants.

■ 12. In the computation of the statutory damages the Court must necessarily make estimates. While this is in the Court's discretion, the Court believes that in the interest of justice it is appropriate to explain its estimate of probable damages. It has done so by estimating the gross revenue produced by the infringing copies of Volumes 1–11, and then subtracting the cost of producing the magazines. This approximates the profit which Fitzgerald would have made by selling the infringing material himself.

Defendant's Exhibit BBB is an invoice which lists the number of magazines printed for each volume of *Golden Legacy*. For Volumes 1–11 a total of 566,250 individual copies were printed and shipped to Baylor by WCP. It seems that most magazines were sold by Baylor for fifty cents (50¢) per copy, so the sale of every infringing copy would generate $283,125 in revenue. It is assumed that Fitzgerald could sell all the copies printed but would not obtain a better price than Baylor when selling large quantities of the magazine. Plaintiff Exhibit 95 is a customer statement of charges from WCP to Baylor which reflects WCP's costs of printing plus overhead and expected profit. For Volumes 1–11 WCP's

charges to Baylor were approximately $62,-255. Subtracting this expense from the estimated revenue yields a figure of $220,-870.

It is understood that this method of calculation is not entirely accurate. Fitzgerald's probable distribution costs should be deducted, but the Court heard no evidence on this point. The Court's conservative estimate of Fitzgerald's potential revenues adequately cancels out this discrepancy. Therefore, it is

ORDERED, that judgment be entered on behalf of plaintiff Fitzgerald Publishing Co., Inc., for $220,870 in statutory damages against the Baylor defendants and defendant World Color Press, Inc., and also $866.50 against Baylor in actual damages for his profits.

SO ORDERED.