RSO RECORDS, INC., MCA Records, Inc., Warner Bros. Records Inc., RCA Corporation, CBS Inc., Casablanca Records and Filmworks, Inc., Elektra/Asylum/Nonesuch Records, a division of Warner Communications, Inc., Plaintiffs,

v.

Joseph PERI, Carl Feuerstein, Sam Peri, Dynasty Graphics, Inc., Creative Disc, Inc., Defendants.

No. 79 Civ. 5098–CSH.

United States District Court, S.D. New York.

Oct. 24, 1984.

Meyers, Tersigni, Kaufman, Debrot, Feldman & Gray, New York City, for plaintiffs; Anthony L. Tersigni, Marye L. Elmlinger, New York City, of counsel.

Alan J. Kraft, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This is a civil action for willful copyright infringement. Plaintiffs are the producers, manufacturers, and distributors of some thirty-five copyrighted sound recordings which they claim have been infringed by the defendants.[1] The corporate defendants are Creative Disc, Inc. ("Creative"), which manufactured and packaged phonograph records, and Dynasty Graphics, Inc. ("Dynasty"), which prepared photographic materials used in the printing of labels and paper packaging for phonograph records and prerecorded cassette and eight-track tapes. Both are New York corporations.

1. Plaintiffs claim that forty-one copyrights are involved here, but several of those are essentially duplications, since they represent separate copyrights for sound recordings and for the artwork which is sold primarily as packaging for the sound recordings.

Creative has never answered the complaint. The individual defendants have all been involved in the manufacture of sound recordings. Defendants Joseph Peri ("Joe Peri") and Carl Feuerstein have admitted being officers and shareholders in Dynasty, and the evidence demonstrates that both were also in control of operations at Creative. Salvatore "Sam" Peri ("Sam Peri") worked in a cassette and eight-track tape duplicating facility called Delmonico Audio Sounds, Inc. ("Delmonico"), which was housed in the same building as Creative. Plaintiffs accuse defendants of copying plaintiffs' copyrighted sound recordings and the packaging of those recordings—in essence, of record counterfeiting. They have requested damages, attorney's fees, and destruction of various tools of reproduction seized from the corporate defendants' places of business. The action was tried to the Court sitting without a jury over the course of seven trial days. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

## I. *Liability*

■ Section 106 of the Copyrights Act of 1976, 17 U.S.C. § 106(1) and (3), grants copyright holders exclusive rights of reproduction and distribution of copyrighted works. *Cf. Alfred Bell & Co. v. Catalda Fine Arts, Inc.,* 191 F.2d 99, 105 (2d Cir. 1951). Those who violate these exclusive rights are classed as "infringers" and may be subject to various statutory remedies pursuant to §§ 502–505 of the Act, including damages. 17 U.S.C. § 501. The severity of the damage award for which an infringer may be held liable depends in part on whether the infringement was "willful."

17 U.S.C. § 504(c)(2). Equally liable with direct infringers are "contributory" infringers, those who with knowledge of or reason to know of the infringing activity of another materially contribute to the infringement. *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971); *Encyclopedia Britannica Educational Corp. v. Crooks,* 558 F.Supp. 1247, 1256 (W.D.N.Y. 1983). Whether a participant in an infringing activity is classed as a contributory infringer does not depend upon his or her "quantitative contribution" to the infringement. "Rather, resolution of the issue ... depends upon a determination of the function [the alleged infringer] plays in the total [reproduction] process." *Gershwin Publishing, supra,* 443 F.2d at 1162 n. 8, quoting *Fortnightly Corp. v. United Artists Television, Inc.,* 392 U.S. 390, 396–397, 88 S.Ct. 2084, 2087, 2088, 20 L.Ed.2d 1176 (1968). *Cf. Sony Corp. of America v. Universal City Studios, Inc.,* — U.S. —, 104 S.Ct. 774, 786, 78 L.Ed.2d 574 (1984).

Defendants are accused of two varieties of infringement. First, it is alleged that they produced "counterfeit" copies of plaintiffs' copyrighted sound recordings. Counterfeit records and tapes are exact copies of sound recordings made without the permission of the copyright holder. Like counterfeit money, counterfeit recordings ideally differ from non-counterfeit items only in their source. Generally, counterfeit[2] phonograph records are produced by copying legitimate (licensed) phonograph records which are purchased in the open market. The counterfeiter makes a tape recording of the legitimate record, and this tape is used to produce the "stampers"[3]

**2.** "Counterfeiting" should be distinguished from "bootlegging," although sometimes the terms are employed as synonyms. Bootlegging is the sale of wholly unauthorized recordings of performances by musical artists. *See United States v. Gallant,* 570 F.Supp. 303, 305 (S.D.N.Y.1983). Counterfeit records, by contrast, are unauthorized copies of otherwise authorized recordings. Frequently bootleg records and tapes are produced by individuals who smuggle tape recorders into live performances or who record live performances broadcast over the radio or television. There is no such thing as a legitimate

copy of a bootlegged work, since all commercial recordings of the portrayed performance are unauthorized.

**3.** Stampers are nickel-plated discs which have inscribed upon them the familiar circular grooves of a phonograph record. The stampers, however, are negatives of the record they reproduce; grooves on the record correspond to ridges on the stamper. Two stampers, one for each side of the record, are pressed together around a hunk of raw vinyl to create the phono-

which the counterfeiter uses for producing new, unlicensed copies of the record. If the counterfeiter is careful, there need not be a significant difference in quality between the legitimate and counterfeit records. Counterfeit tapes are similarly produced from legitimate phonographic records. A legitimate record is recorded onto a "master" eight-track or cassette tape, and this master tape is then duplicated endlessly to produce counterfeit copies of the original recorded work.

In addition, defendants are accused of contributing to the production of counterfeit records and tapes through production of materials essential to the printing of packaging for counterfeits. A key ingredient of successful counterfeits is the inclusion of proper packaging materials—labels and jackets for records, labels and cardboard boxes for tapes. These packaging materials are known in the parlance as "graphics," for they generally include drawings or photographs which are designed to complement the recording. In order to escape detection, the counterfeit graphics must be printed to look exactly like those of the original. This is accomplished by photographing the labels and packaging of the originals and using these photographs as the basis for the printing of counterfeit graphics. A critical component of this process is the production of "color separations." A color separation is a series of four negative or positive photographs, each in a different color, of the same set of graphics. These four photographs can be used as the basis for reproducing four-color printed copies of the original graphics. Defendants are accused of producing color separations which reproduced the graphics for many of plaintiffs' copyrighted sound recordings.

■ Record and tape counterfeiting is quite plainly copyright infringement. Sound recordings are specifically accorded copyright protection by 17 U.S.C. § 102(a)(7). Counterfeiting consists of the exact duplication and subsequent sale of these sound recordings. It consequently violates the copyright holders' exclusive rights of both reproduction and distribution. 17 U.S.C. § 106(1), (3). *Cf. Heilman v. Bell*, 583 F.2d 373, 375 (7th Cir.1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979), and cases cited therein; *RCA Records v. All-Fast Systems, Inc.*, 594 F.Supp. 335 (S.D.N.Y.1984).

■ The question of whether the making of color separations of copyrighted graphics constitutes infringement leaves more room for dispute. Graphic works, too, are expressly granted copyright protection, 17 U.S.C. § 102(a)(5), but color separations are not exact reproductions of copyrighted graphics. While they do reproduce the copyrighted image, they split its color scheme into four parts and frequently portray the image in that distorted manner familiar from photographic negatives. The issue rarely requires resolution, however, because color separations have little use except as one step toward the printing of exact copies of the copyrighted graphics. Because the step is an essential one, their makers are ordinarily contributory infringers even if not technically infringers, and they are liable as though they had infringed. Further, even if the specific graphics copied are not copyrighted, thus making their reproduction infringement, reproduction of the graphics is essential to successful counterfeiting of a copyrighted sound recording. Because the making of an accurate color separation is a crucial step in the process of record counterfeiting, those making the color separation may be held liable for infringement of the recording itself.

## A. *The Evidence*

Dynasty and Creative had production facilities in Mount Vernon, New York. As its name implies, Dynasty specialized in producing artwork for record jackets and tape boxes. Its tools were primarily cameras and photographic film. (Transcript 90–91; Plaintiffs' Exhibit 2). Creative operated a manufacturing plant which stamped out

graph record, the ridges on the stampers being transferred to the vinyl as grooves.

phonographic records and packaged them with labels, sleeves, jackets, and "shrink wrap," the familiar clear plastic sheathing in which most records are sold. (Tr. 89). Delmonico, a non-party which employed Sam Peri, was located in the same building as Creative and performed similar manufacturing processes in producing pre-recorded tapes. As noted, Joe Peri and Feuerstein admit to being officers and shareholders of Dynasty. (Answer, ¶¶ 5, 6). The evidence is clear, however, that they also played major roles in Creative. Joe Peri maintained an office at Creative (Tr. 89), Feuerstein admitted to being production manager at Creative (P. Ex. 10, at 23–24), and defendants' witnesses, legitimate customers of Creative and Dynasty, repeatedly referred to both defendants as the people responsible for running the Creative operation. In addition, Joe Peri was an expert at pre-recorded tape reproduction and spoke of Delmonico's operations knowledgeably and in a proprietary fashion. (P. Ex. 16 and 17, generally; P. Ex. 44, at 43). He, perhaps Feuerstein, and others owned Delmonico. (P. Ex. 44, at 32; P. Ex. 10, at 24). Joe Peri and Feuerstein ran the company's operations. (P. Ex. 44, at 32). The general impression conveyed by the evidence is that Creative, Dynasty, and Delmonico were all part of an integrated sound recording reproduction business run by Joe Peri. The evidence indicates that Feuerstein played a particularly important role in the organization's record and tape duplication business, but he apparently considered himself under Joe Peri's authority. (*See* Tr. at 68; P. Ex. 44, at 44).

In the late 1970's, the Federal Bureau of Investigation began an undercover investigation into record and tape counterfeiting activities in the eastern United States. Their explorations eventually led them to the Creative-Dynasty organization. The bulk of plaintiffs' evidence is the fruit of this branch of the investigation. Further fruit of the investigation was Joe Peri's plea of guilty to two counts of criminal copyright infringement (P. Ex. 7, 8). In return for this plea, the Justice Department agreed not to prosecute Joe Peri, Feuerstein, Creative, Dynasty, Delmonico or any of their employees for any other non-tax crimes they may have committed in connection with these businesses prior to April 1979—the period of time covered by this lawsuit.

The bulk of plaintiffs' physical evidence of infringement consisted of phonograph records and color separations seized by the FBI during a two-day raid, conducted pursuant to search warrant, of the Creative and Dynasty premises on December 6 and 7, 1978. The avowed purpose of the agents was to locate and seize evidence of unlawful copying as well as machinery used for such copying. Among the items seized were color separations reproducing the graphics of some twenty-seven sound recordings copyrighted and distributed by plaintiffs, admitted into evidence as Plaintiffs' Exhibits 23–A through 23–J.[4] In addition, the agents found copies of one of plaintiffs' copyrighted recordings along with evidence indicating that these copies and copies of a second of plaintiffs' recordings had been manufactured by defendants.[5] None of this copying was authoriz-

---

**4.** Attached as Appendix A is a table listing the artists and titles of the musical works whose graphics were copied, the copyright number of the work, the copyright owner, the trial transcript page on which the graphics are identified, and the exhibit number of the color separation on which they appear. All color separations were made by photographing the graphics of apparently legitimate pre-recorded eight-track or cassette tapes. Copies of the copyright certificates are in evidence as Plaintiffs' Exhibit 36.

**5.** In evidence are 200 copies of the album "Bat Out of Hell," by an artist named Meatloaf, which had been purchased by an FBI agent

from Creative. (Tr. 68, P.Ex. 4; P. Ex. 19–22). The copyright for this album is owned by CBS. The raiding agents seized Meatloaf record sleeves, the paper sleeves which fit over the record and inside the record jacket, jackets and labels, as well as stampers for pressing this album. (Tr. 68, 149, 240–250; P.Ex. 3, 24–28, 23–B, 39). Also seized were copies of the record "Breezin'" by George Benson, record jackets for this album, and stampers for pressing it. (Tr. 149, 240–250; P.Ex. 29–34, 35, 23–A, 38). The "Breezin'" copyright belongs to plaintiff Warner Brothers Records, Inc. The presence of labels and jackets in addition to packaged record al-

ed by plaintiffs. (Tr. 313). Also seized was evidence of the unlawful duplication of copyrighted recordings produced by various other recording companies which are not parties to this action.[6]

In addition to presenting evidence of materials seized during the FBI raid, plaintiffs relied on testimony by FBI agents who had witnessed or participated in acts of counterfeiting with defendants. Agent Robert Levey, who posed undercover as an entrepreneur starting out in the counterfeiting business, introduced a tape recording secretly made during a meeting with Joe Peri and Feuerstein. (P.Ex. 16, 16A, 17, 17A). During the conversation, Levey and his partner requested Joe Peri's help in setting up a plant for duplicating counterfeit eight-track and cassette tapes. Although Joe Peri carefully disavowed personal participation in counterfeiting (P.Ex. 16, at 17), he disclosed a remarkably intimate knowledge of the counterfeiting business. The discussion was enlivened by his casual gossip about the counterfeiting world (P.Ex. 16, at 13, 17, 19–25; P.Ex. 17, at 1–3). He boasted that he had originally established in the business one subsequently convicted counterfeiter (P.Ex. 16, at 22), passed on tips for avoiding detection (P.Ex. 16, at 15), and bemoaned the difficulties counterfeiters face (P.Ex. 16, at 16). These and other similarly suggestive comments make his express denial appear disingenuous.[7]

Feuerstein was also recorded on this day, and although he had little to say he, too, made passing references to personal participation in the counterfeiting business.[8] Agent Levey also testified that at a later date he purchased from Joe Peri at Dynasty a series of color separations for use in manufacturing counterfeit tape labels (Tr. 73–78) and from Feuerstein at Creative 200 copies of a counterfeit CBS album. (Tr. 68). According to Agent Levey's account of the meetings at which these sales were consummated, Joe Peri openly discussed his hoped-for sale of counterfeit Elvis Presley records to a well-known counterfeiter. (Tr. 59). He then told the agent that before he could make the color separations the agent would have to purchase legitimate tapes from a local retail store so that their graphics could be photographed and copied. (Tr. 59). This was done, and finished color separations of the graphics of certain copyrighted recordings were eventually sold to Levey by Joe Peri. (Tr. 60, 77–79, 112). While in Dynasty on these occasions, the agent noticed completed color separations for a number of other copyrighted works. (Tr. 73, 77).

It was when Levey returned to Creative with the legitimate tape cartridges which were to be copied that he noticed several boxes of copies of the copyrighted CBS record. He asked Feuerstein if he could

bums suggests that the records were pressed and packaged at Creative.

6. The agents seized a number of other records, record jackets, and record labels which they thought to be counterfeit. (*See* P.Ex. 3). Of these, there is evidence that the copies of records by Elvis Presley, The Beatles, and Led Zeppelin were unauthorized. (P.Ex. 4, at 16).

7. Describing a set of his favorite tape duplicators, Peri says "I'm averaging 4,000–5,000 pieces a week. This is you're [sic] best bet, and it makes a damn good tape.... This is a bootleggers [sic] paradise." (P.Ex. 16, at 9). Although this reference to bootlegging (in context, synonymous with counterfeiting) could be interpreted as referring to the agents' contemplated business, Peri soon after comments, "if you had a Columbia product, I'll make a master in two minutes and put it in there and I'll play it, then I'll mix 'em up and you'll never know the real ... (inaudible speaking)," *id.*, an apparent refer-

ence to the counterfeiter's art. Perhaps most telling, when the agents mention their intention to start producing 2,000 counterfeit tapes a week Peri comments jokingly, "A week? ... I'm gonna go broke." (P.Ex. 16, at 4). It is the increased competition from new counterfeiters, presumably, which would put him out of business.

8. In response to the agents' mention of some gossip about the bad end of a counterfeiter who was caught by record company strongmen, Feuerstein comments, "You never realize how many people have eyes and ears.... When you think your [sic] dealing with somebody light, and you tell somebody what you're doing and you have a lot of problems. You make up your mind to do something you better know all the pitfalls as well as the so called glory part of it." (P.Ex. 17, at 13).

buy two hundred copies. Feuerstein referred him to Joe Peri, who gave permission and offered 2,300 copies more. Two hundred were actually purchased. (Tr. 68–69).

There was a small amount of evidence of defendants' duplication of copyrighted tapes. At the deposition of Sam Peri before Magistrate Washington,[9] Peri admitted having witnessed the duplication of one of RSO Records's copyrighted tapes. (P.Ex. 44, at 40). A second witness, Fredrick Kaufman, an undercover investigator with a recording industry professional association, also testified at Sam Peri's deposition. As part of his own counterfeiting investigation, Kaufman had successfully penetrated the counterfeiting world, and he had visited the Delmonico plant many times during its course. He confirmed the counterfeiting of this tape—two thousand pieces on one particular occasion—as well as of a second one. (P.Ex. 44, at 73, 77).

The above evidence constitutes plaintiffs' evidence of infringement. The remainder of their case consisted of production records seized from Creative and a summary thereof. The records demonstrate that from August, 1977, through November, 1978, Creative pressed nearly 1.8 million records. (P.Ex. 43). Production of tapes at Delmonico was in the range of three to four thousand tapes per day. (P.Ex. 44, at 35).

The defendants refused to answer virtually all questions and refused to produce documents at their depositions, invoking their Fifth Amendment right to avoid self-incrimination. Nor did they testify at trial. They did, however, present a series of witnesses whose unchallenged testimony demonstrates that a substantial amount of Creative's output—approximately 200,000 records during the period covered by the seized production records—was produced for relatively small legitimate record production companies.

### B. *Infringement*

Defendants' liability turns on two questions: (1) whether they violated any of plaintiffs' exclusive rights as copyright owners, 17 U.S.C. § 501(a), and (2) whether, if so, they did so "willfully." 17 U.S.C. § 504(c)(2). A finding of willful infringement quintuples maximum statutory damages available under § 504(c).

 It is clear that infringement has occurred. It is conceded that none of the defendants was ever licensed to duplicate any of plaintiffs' copyrighted works. Yet obtained from the plant were copies of two of plaintiffs' records,[10] and there is direct evidence of copying of at least one of plaintiffs' tapes.[11] Although there might be a legitimate explanation for the presence of the copies of the records, defendants have proffered none. Further, the presence of the component parts of record manufacture —stampers, labels, and album covers—suggests that the records were manufactured at Creative. In the absence of any explanation from defendants, I have no choice but to draw the logical inference and find that Creative manufactured copies of these records. In light of the testimony of tape duplication mentioned above, I also find that Delmonico manufactured copies of the tape "Saturday Night Fever." Since none of this copying was authorized, it violated plaintiffs' rights of exclusive reproduction.

While Creative pressed records, Dynasty produced color separations. Defendants initially attack the sufficiency of plaintiffs' evidence of copying in this connection. They point out that not all the color separations are complete, containing less than the necessary four photographs, and some are "continuous tone," a physical state which

---

9. I reserved a ruling at trial on defendant's relevance objection to this deposition. Although a few of the questions asked and answered at this session may be of marginal relevance—Sam Peri's schooling, for example—I find the bulk of the deposition highly relevant. I overrule the objection.

10. The copied records were Warner Brothers' "Breezin'," copyright number N31278, and CBS's "Bat Out of Hell," copyright number N46849.

11. The copied tape was RSO's "Saturday Night Fever," copyright number SR5–560. (*See* P.Ex. 44, at 40, 73, 77).

prevents them from being used in the printing of graphics without further processing. They argue that plaintiffs have thus failed to prove either infringement—the reproduction of plaintiffs' graphics—or contributory infringement—the production of color separations which were knowingly to be used for infringing purposes because some of these separations are useless for printing.

Based on the whole of the evidence, I cannot agree. It must be remembered that the items seized by the FBI—and the photographs in evidence are only a portion of the photographs seized, as is evident from the return on the search warrant (P.Ex. 1)—represent only a snapshot, as it were, of Dynasty's production processes. These were the items present in the company on one random day. It is not surprising that certain color separations were incomplete or incompletely processed. It is a fair inference that if the agents had come a day later, some of these would have been completed, and some of the completed separations now in evidence would have been sent off to customers or transferred for use in printing graphics used by Creative and Delmonico. The testimony of Agent Levey demonstrates that defendants did produce and sell separations to order. While there is no direct proof, it is an equally fair inference from the circumstances that defendants used such separations in the counterfeiting activities of Delmonico and Creative documented above. The information necessary to rebut the FBI's unfavorable snapshot by demonstrating the legitimacy of Dynasty's operations lay in defendants' hands, and they refused to answer questions or to produce documents.

■ This observation calls up the issue of the evidentiary impact of defendants' invocation of the Fifth Amendment. In the context of a criminal action, of course, no inference may permissibly be drawn by the trier of fact from a defendant's refusal to testify. This protection does not, however, carry over into the civil sphere, where constitutional concerns are lessened. *Brink's Inc. v. City of New York*, 717 F.2d 700, 709

(2d Cir.1983). In civil matters the trier of fact is permitted to draw an adverse inference from a party's refusal to testify, although it is unlikely that the refusal to testify alone could support an adverse finding. *See Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n. 5, 97 S.Ct. 2132, 2137 n. 5, 53 L.Ed.2d 1 (1977); *SEC v. Scott*, 565 F.Supp. 1513, 1533 (S.D.N.Y.1983); *SEC v. Musella*, 578 F.Supp. 425, 430 (S.D.N.Y. 1984). I do not find it in any way unfair to draw adverse inferences in this action. Much of the information necessary to plaintiffs' case is in the hands of the defendants. Permitting them to avoid incrimination thus has the effect of closing off accepted routes of civil discovery. Further, there is no realistic threat of a prosecution; Joe Peri's plea agreement immunized all defendants against criminal prosecution for actions taken during the time at issue here. (P.Ex. 5). *See SEC v. Musella, supra,* 578 F.Supp. at 429, 431. Consequently, I infer from the evidence discussed above as well as defendants' refusal to respond to it that these color separations were simply a representative sample of the type of separations produced by Dynasty over the period in question. I find that the separations, whether complete or not, indicate that actual color separations of the graphics listed in Appendix A were prepared at Dynasty during the time period in question.

As was noted above, the primary use of color separations is in the printing process. The only documented use of color separations such as these is in the printing of labels and packaging for records and tapes. Indeed, such printing apparently demands some type of color separations. Defendants' witnesses testified that in manufacturing legitimate recordings the defendants frequently created their own graphics for the recordings which Creative pressed, a process which necessarily involved the production of color separations. In addition, Agent Levey testified that Dynasty produced several color separations for infringing use at his request. From all of this evidence, there is no reasonable inference to draw other than that these color separations, too, were intended for use in printing

labels. In any event, it was incumbent on defendants to rebut this inference by suggesting a non-infringing purpose for the separations. When asked about them, they invoked Fifth Amendment privileges. (P.Ex. 11, at 7, 9; P.Ex. 12, at 23–24; P.Ex. 13, at 8, 10). From this I infer that the intended purpose was the printing of graphics.

It is not clear whether defendants intended to use the color separations in printing labels and packaging for their own infringing recordings or whether these were produced for sale to other infringers like undercover agent Levey, but the distinction is legally insignificant. As discussed above, the production of color separations is a necessary part of the process of counterfeiting, since accurate reproduction of a recording's graphics is essential if the illegitimate copy is to escape detection. Therefore, even if defendants did not use the color separations themselves, if they knew that the separations would be used for infringing purposes, they committed contributory infringement by producing them. I find that plaintiffs have proven that defendants knew or had reason to know of the infringing nature of their acts. First, the experience of Agent Levey demonstrates defendants' willingness to produce color separations for someone they believed to be a counterfeiter. Second, the very nature of color separation manufacture—the photographing of the packaging of copyrighted records and tapes—would suggest infringement to a rational person. There is simply no other realistically imaginable use for the products. Finally, when asked about the color separations at their depositions, defendants, as noted above, uniformly refused to answer questions because of fears of self-incrimination. Again, this evidence convinces me that defendants knew that their separations would be used to aid infringement, either their own or others'.

In conclusion, from the evidence discussed above I find that defendants produced color separations of the graphics listed in Appendix A that the purpose of these separations was to aid the printing of graphics for use with counterfeit records and tapes, and that defendants knew of this purpose. They have contributorily infringed those twenty-seven copyrights.

## C. *Liability*

■ Throughout this section I have referred to the defendants as one unit. Yet the individual defendants cannot be held liable for the infringements which occurred at these companies unless they were personally involved in the infringing actions or had the right and ability to supervise them and had a financial stake in them. *Gershwin Publishing Corp., supra*, 443 F.2d at 1162; *Lauratex Textile Corp. v. Allton Knitting Mills Inc.*, 517 F.Supp. 900, 904 (S.D.N.Y.1981).

■ The evidence indicates that Joe Peri was personally involved in all aspects of this activity. His conversations and dealings with Agent Levey demonstrate that he was intimately involved in the activity at Delmonico [12] and Dynasty. (P. Ex. 16, 17; Tr. 56–60; 68–78). Further, Feuerstein's deference to him regarding sales of Creative's products, his office at Creative, his knowledge of Creative's inventory (Tr. 68–69), and defendants' own witnesses' repeated references to him as the co-owner and co-operator of Creative with Feuerstein, all indicate that he was also personally involved in that company's infringement. Further, Joe Peri's admission of ownership of Dynasty, his proprietary attitude toward Delmonico (P. Ex. 16, 17), and defendants' witnesses' referrals to him as a Creative owner make it appear that he also had a financial interest in all these corporations.

Feuerstein was clearly in charge of operations at Creative, and Sam Peri testified that Feuerstein was a supervisor at Del-

---

**12.** Defendants have argued that they cannot be held liable for tape infringement because Delmonico, the corporation which infringed the copyright, is not a party. On the contrary, defendants are liable for all infringement in which they personally participated. The failure to join Delmonico simply means that the corporation cannot be held liable. It does not prevent plaintiffs from recovering for infringing acts occurring on the corporation's premises.

monico (P.Ex. 44, at 32, 36). Feuerstein admitted part ownership of Delmonico (P.Ex. 10, at 24). His personal involvement with the infringement at Creative and his financial stake in and supervision of operations at Delmonico make him liable for damages assessed on the basis of those corporations' activities. He has admitted co-ownership in Dynasty, but there is no evidence that he supervised or was personally involved in its work. He appears rather to have restricted his activities to supervising production at Creative and Delmonico, leaving Dynasty to Joe Peri. On this record, I find insufficient evidence of personal involvement to hold Feuerstein liable for Dynasty's activities.

Sam Peri was apparently not involved in either Dynasty or Creative. His sole documented acts of infringement are the mastering—that is, the transfer of a legitimate recording onto a master tape for use in the duplication process—of two counterfeit tapes, "Grease" and "Saturday Night Fever," (P.Ex. 44, at 73), and there is no direct evidence that the former tape was ever duplicated. There is no basis to hold him liable for any activity other than the infringement of these tapes.

The final issue of liability is whether defendants' infringement was willful. "Willfully" as used in 17 U.S.C. § 504(c)(2) means "with knowledge that the defendant's conduct constitutes copyright infringement." 3 Nimmer on Copyright, § 14.04[B], at 14–28 (1984); see *Fallaci v. New Gazette Literary Corp.*, 568 F.Supp. 1172, 1173 (S.D.N.Y.1983). Joe Peri admitted at his allocution to a guilty plea on two counts of criminal copyright infringement that he knew his conduct was unlawful. (P.Ex. 8A, at 9). The crime to which he confessed was identical to the behavior at issue here: production (and sale) of infringing color separations to individuals who he knew would use them to print graphics for counterfeit tapes. I see no reason to doubt Peri's word nor to find that he did not similarly recognize that the other infringing acts here alleged, actual copying, were unlawful.

Carl Feuerstein has not gone on record as admitting knowledge of the unlawfulness of counterfeiting. He did, however, invoke the Fifth Amendment when asked about his counterfeiting activities. Since his behavior would have been criminal only if he recognized its unlawful nature, I infer from his refusal to answer that he had such knowledge. Further, his comments to Agent Levey, transcribed and quoted at footnote 8, *supra*, indicate that he recognized that he was in a business demanding circumspect behavior. I assume that he recognized that the reason for that caution was the illegal nature of the activity. Feuerstein worked closely with Joe Peri and owned shares in each of the three corporations involved here, all of which were involved in counterfeiting. Nor was this counterfeiting a side-line. The production records seized by the FBI show that over a period of less than two years defendants produced approximately 1.8 million records. Of these, defendants have been able to demonstrate the legitimacy of only about 200,000. *See* page 11, *supra.* Joe Peri, who worked so closely with Feuerstein, has admitted his knowledge of the counterfeiting's unlawfulness. I find it impossible under the circumstances to suppose that Feuerstein was not similarly aware.

Sam Peri presents a more difficult case. Aside from the testimony of Frederick Kaufman, there is no direct evidence of Sam Peri's personal involvement in the acts alleged. Sam Peri himself has given essentially contradictory testimony. At his deposition he refused to answer any questions on the ground that he feared self-incrimination. The inference which would naturally be drawn from this testimony is that he knew that counterfeiting was unlawful. One and one-half years later, however, he requested an opportunity to be deposed before Magistrate Washington in hopes of exculpating himself. At that time he admitted seeing infringing tapes (P.Ex. 44, at 40), but he claimed that he did not know counterfeiting was going on in the plant until after the FBI raided it (P.Ex. 44, at 47).

Under the circumstances, I simply cannot credit Sam Peri's self-serving denials. He was a college-educated young man working in his father's tape duplicating company. One of his jobs was to copy copyrighted records onto tape for duplication. He could not have done so without listening to the music and, presumably, seeing the copyright symbol on the record label. It is difficult to believe that anyone with some college education would not be aware of this act's unlawful nature. It is even more difficult to believe when the copier's father and immediate boss, Feuerstein, are well aware of the illegal nature of the activity. Fredrick Kaufman's testimony suggests that Sam Peri recognized the wrongfulness of his conduct. Sam Peri himself displayed this awareness by invoking the Fifth Amendment's protections when questioned about his actions at a deposition. I cannot help but conclude that his later denials simply reflected a desire to escape threatened liability, and I do not credit them. I find Sam Peri's behavior to have been willful.

### Damages

■ Prevailing copyright plaintiffs may elect to recover either actual damages plus defendants' profits or statutory damages. 17 U.S.C. § 504(b) and (c); *Stevens Linen Associates v. Mastercraft Corp.*, 656 F.2d 11, 14 (2d Cir.1981). Rather than specifically elect, plaintiffs have requested that the Court award whichever type of damages results in the greatest award.

### A. *Actual Damages*

■ Plaintiffs have not attempted to demonstrate their own damages directly. It would be reasonable to assume that for every counterfeit copy of plaintiffs' copyrighted records and tapes sold by defendants plaintiffs lost a corresponding sale. Unlike the situation in *Stevens Linen, supra,* 656 F.2d at 14–15, defendants' copies were presumably sold at retail for the same price as plaintiffs'. Sales volume would not have been inflated. Plaintiffs were stymied in any attempt to calculate damages by this method, however, by defendants' refusal, on Fifth Amendment grounds, to turn over any further production records or to aid in the interpretation of the records which had already been seized from them. In addition, defendants refused to discuss the destiny of the many color separations seized. Thus it was impossible for plaintiffs to determine with certainty whether these caused additional damages by being used by defendants or others in producing counterfeit records and tapes, although it may be assumed that they were.

Plaintiffs choose instead to rely on their own financial analyses of defendants' profits derived from the production records seized from Creative.[13] This is permissible, since plaintiffs may recover profits to the extent that they exceed damages. 17 U.S.C. § 504(c)(1). The production records apparently state Creative's production of phonograph records from August, 1977, through November, 1978. They are easily interpreted as listing the machine on which the record was pressed, the size of the record ("LP" or "45"), the customer for which the record was pressed, the record's identification number, and the quantity of copies pressed. Plaintiffs' summary of the records, the accuracy of which I have no reason to doubt, shows that approximately 1.8 million records were pressed during this time. Defendants presented a series of witnesses who testified to the legitimacy of approximately 200,000 of these pressings, thus leaving 1.6 million unaccounted for. Plaintiffs argue that I should presume that all of these remaining records were counterfeit and award them damages based on the expected profits from sales of 1.6 million records.

I am prepared to draw the inference that the bulk of these sales were illegitimate. There is substantial evidence to indicate

---

**13.** Defendants requested that these records be admitted against Creative only. In light of my findings as to Joe Peri's and Feuerstein's roles in Creative, however, it is clear that they are admissible against all these defendants as well.

defendants' counterfeiting proclivities, and defendants' failure to account for the legitimacy of these records did not occur for want of trying.[14] However, I cannot make the additional inference implicit in plaintiffs' request, that is, that all of these illegitimate records infringed copyrights *owned by plaintiffs.* Plaintiffs have no legal right to the profits defendants made by infringing others' copyrights. There is substantial evidence that defendants infringed copyrights owned by others. (P.Ex. 3). The production records themselves refer to many recordings which are not copyrighted by plaintiffs. In addition, the evidence demonstrates that the production records frequently refer to infringed phonograph records by the identification numbers assigned to them by the recording companies which owned the copyright. (P.Ex. 23, at 33–35). If plaintiffs truly wished to use these production records to pinpoint the profits defendants made by infringing their copyrights, they could have isolated the references to their own record identification numbers. This would at least have been a start toward accurately quantifying their damages. They made no such attempt. In these circumstances, I find the production records unreliable as a general estimate of plaintiffs' damages. They simply do not afford a rational basis from which to calculate appropriate damages.

The production records do contain some interesting information. Plaintiffs have presented direct evidence that two of their records were copied by Creative. One of these was "Breezin'" by George Benson, the identification number of which is 2919 (P.Ex. 23, at 34; P.Ex. 23–A). My own perusal of the production records summary located three references to "2919," which when combined indicate a total production of 12,751 records. (P.Ex. 43, at Subschedule A–8, line 43; Subschedule A–11, line 6; Cash Sales, line 31). The defendants ap-

parently charged $2.75 for a counterfeit record. (Tr. 68). Their charge for pressing and packaging a legitimate record was about 41 cents. (D.Ex. F). It is reasonable to expect that their costs for legitimate and counterfeit records were similar and to assume, therefore, that at least some of their billed price to legitimate customers included a mark-up above costs. Thus their profit per counterfeit record amounted to at least $2.35, perhaps more. From this it can be deduced that defendants made approximately $30,000 by infringing Warner Brothers' "Breezin'" copyright. Unfortunately, there are no similar production figures for the "Bat Out of Hell" record and "Saturday Night Fever" tape, which have also been documented as infringed. There are only anecdotal references to quantities of these, which are most likely incomplete.

The damages arising from the color separations are even less susceptible to accurate quantification. The evidence indicates that Dynasty sold infringing color separations for $100. (Tr. 78). Their costs are undocumented. This does not begin, however, to estimate the damages for which defendants may be held liable. These color separations contributed to the production of counterfeit records and tapes, each sale of which cost plaintiffs a sale. As contributory infringers, defendants are liable for these actual damages as well as their profits from the separations. But there is absolutely no information on the number of color separation sales made, to whom the separations were sold, and how many infringing recordings those buyers sold using labels printed with the separations.

In sum, if I were to set actual damages plus profits under § 504(b), the award would equal $42,239.85: $29,964.85 for "Breezin'," $5,875.00 for "Bat Out of Hell," $4,700.00 for "Saturday Night Fever," and $2,700.00 for the twenty-seven color separations.[15] Although actual prof-

---

**14.** It is worth noting in support of the accuracy of the records that whenever one of defendants' witnesses testified to having had legitimate records pressed by Creative, a quantity of that witness's records was located in the production records, generally the quantity listed accorded

with the witness's memory of the quantity produced.

**15.** The calculations are based on record and tape profits of $2.35 per unit, as described above. There is documentation of copying of

its and damages were likely much higher, there is no factual basis from which to calculate them.

## B. *Statutory Damages*

Statutory damages are the other option. Section 504(c)(2) permits an award of statutory damages of up to $50,000 per infringed work [16] when, as in this case, the infringement was willful. The statute leaves the exact amount of the award to the discretion of the Court, to be set "as the court deems just." 17 U.S.C. § 504(c)(1). The case law on statutory damages is still in its formative stages. Undoubtedly assessed statutory damages should bear some relation to actual damages suffered. Because statutory damages are often used in cases where actual damages cannot be precisely calculated, however, they cannot be expected to correspond exactly. Further, courts have also recognized that Congress's provision for a greater award in cases of willful infringement indicates that statutory damages may in such cases exceed the amount of documented damages. By taking on a partially punitive character, such awards serve the Copyrights Act's twofold purpose of compensation and deterrence. *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 592 F.2d 651, 657 (2d Cir.1978); *Lauratex Textile Corp. v. Allton Knitting Mills Inc.*, *supra*, 517 F.Supp. at 904. For example, after finding actual damages of $5,000, Judge Duffy in *Lauratex Textile Corp. v. Allton Knitting Mills Inc.*, 519 F.Supp. 730, 733 (S.D.N.Y.1981) awarded $40,000 in statutory damages because of defendant's willful and repeated infringements. Similarly, Magistrate Buchwald, finding willful infringement, doubled the amount of actual

damages suffered by plaintiff in awarding statutory damages of $10,000 in *Fallaci v. New Gazette Literary Corp.*, *supra*, 568 F.Supp. at 1174. *See also Milene Music, Inc. v. Gotauco*, 551 F.Supp. 1288, 1296 (D.R.I.1982) ("Courts have ... focused largely on the element of intent, and the per-infringement award tends understandably to escalate, in direct proportion to the blameworthiness of the infringing conduct."); *Hospital For Sick Children v. Melody Fare Dinner Theatre*, 516 F.Supp. 67, 72–73 (E.D.Va.1980) (quadrupling amount of profits as award of statutory damages upon finding of willful infringement).

An additional factor must be considered in setting statutory damages in this action. Any information which may be available on the exact amount of profits or damages is entirely in the hands of the defendants. They are the only ones capable of interpreting their own production records and specifying how the infringing color separations were used. They have chosen to remain silent. Plaintiffs should not be penalized thereby.

The one incident of infringement on which partial information on damages is available demonstrates that defendants made a minimum of $30,000 in illicit profits. It is likely that the other infringed phonograph record, "Bat Out of Hell," and the infringed tape, "Saturday Night Fever," were produced in quantities similar to "Breezin'," since all were very popular recordings. Defendants, in any event, have not shown "Breezin'" to have been exceptional. The probable size of the damages combined with the large-scale and willful

---

12,751 units of "Breezin'" (P.Ex. 43), 2,500 units of "Bat Out of Hell" (Tr. 68–69), and 2,000 copies of "Saturday Night Fever" (P.Ex. 44, at 77). Defendants have documented no expenses of color separation production. I assume that all of the price charged represented profit.

**16.** The language of § 504(c)(1) makes it clear that plaintiffs may not recover multiple statutory awards where they have copyrighted both graphics for a recording and the recording itself. Nor can they recover separate statutory damages for record and tape infringement.

Each "work" is entitled to only one award of damages. House Report No. 94–1476, at 162, quoted in 1976 U.S.Code Cong. & Admin.News 565, 577. Inasmuch as graphics simply complement the recording and have no separate economic value, whatever their artist value, they must be considered part of the musical "work" for purposes of the copyright statute. A separate award for their infringement is not permitted. Similarly, tape and phonograph record are simply two media for presenting the same "work," precluding separate awards.

infringing activity of defendants thus makes appropriate an award of maximum statutory damages of $50,000 for each infringement. Plaintiffs will recover a total of $150,000 for these three infringements.[17]

For similar reasons, I reach the same conclusion as to the color separation infringements. Joe Peri admitted selling color separations to Jerry Pettus, regarded as the most active counterfeiter in the nation. (Tr. 56). Another Dynasty customer was Murry Kaplan, who was also under investigation by the FBI for counterfeiting. (Tr. 77). Thus, it is clear that Dynasty provided color separations not only for their own counterfeiting operations but those of others. In this manner Dynasty likely contributed to the making of thousands of counterfeit records and tapes. Again, the information which would indicate the scope of this activity is wholly in defendants' hands, and they have not disclosed it. Because it is likely that Dynasty's color separations each contributed to the counterfeiting of thousands of records and tapes, thus depriving plaintiffs of thousands of sales and was undertaken in a wholly willful manner, the maximum statutory award is again appropriate. Statutory damages of $50,000 are awarded for each of the works in Appendix A except "Saturday Night Fever," which was already the subject of a maximum award. See footnote 16, *supra.*

If plaintiffs elect statutory damages, the total award will be $1,450,000. Of this, Joe Peri and Dynasty will be jointly and severally liable for $1,300,000, the damages assessed in connection with the color separations. Joe Peri, Feuerstein, and Creative will be jointly and severally liable for $100,000, the damages assessed for record duplication, and Joe Peri, Sam Peri, and Feuerstein will be jointly and severally liable for $50,000, the damages assessed for tape duplication.

### C. *Destruction of Seized Items*

 Plaintiffs requested and were granted an order of impoundment of some of the corporations' machinery and invento-

ry early in the litigation. They now request that this machinery and inventory be either destroyed or turned over to them pursuant to 17 U.S.C. § 503(b), which permits a court to order "the destruction or other reasonable disposition of all copies ... found to have been made or used in violation of the copyright owner's exclusive rights, and of all ... other articles by means of which such copies ... may be reproduced." The similar provision of the 1909 Copyrights Act was interpreted to include destruction not only of molds, masters, and copies which specifically contain the image of the copyrighted work, but also of the machinery used in the duplicating process. *Duchess Music Corp. v. Stern,* 458 F.2d 1305, 1308 (9th Cir.), *cert. denied,* 409 U.S. 847, 93 S.Ct. 52, 34 L.Ed.2d 88 (1972). Whether to order destruction lies within the discretion of the district court. *Martin Luther King, Jr. Center for Social Change, Inc. v. American Heritage Products, Inc.,* 508 F.Supp. 854, 861 (N.D.Ga.1981), *rev'd on other grounds,* 694 F.2d 674 (11th Cir.1983). Plaintiffs have made a prima facie case that the equipment seized was used primarily for infringing purposes and that the inventory seized was created without proper licensing. It is thus defendants' burden to demonstrate which articles were not used for infringement or were created with authorization. Save for the witnesses who testified to the legitimate production of some 11% of Creative's output, defendants have failed to do so.

I find that the machinery seized was used substantially for unlawful purposes. Disposal of it under 17 U.S.C. § 503(b) is appropriate. *Compare, RCA Records v. All-Fast Systems, Inc., supra,* 594 F.Supp. at 340. Further, the bulk of the inventory was unlawfully created, making destruction appropriate.

However, plaintiffs are directed to return to defendants any molds, masters, tapes, phonograph records, or stampers which are the products of or contain impressions or

---

**17.** Plaintiffs have requested that the Court award damages in one lump sum, leaving to

them the task of splitting up the award among themselves.

recordings of products of the witnesses who testified on behalf of defendants.[18] There is no ground for seizure of these.

Plaintiffs are directed to destroy all other recordings, record jackets, labels, masters, stampers and other objects which contain impressions of or copies of copyrightable material. Plaintiffs are directed to sell any remaining machinery, which would presumably be equipment for general photographic or sound duplication and can be used for legitimate, non-infringing purposes. The proceeds of this sale, minus the costs of sale, are to be applied pro rata against the damages assessed against defendants. Such a sale is clearly contemplated by the "other reasonable disposition" language of Section 503(b) and is far preferable to the destruction of useful duplicating equipment.

### D. *Attorney's Fees*

██ Plaintiffs also request costs and attorney's fees, permitted to a prevailing party by 17 U.S.C. § 505. Courts have generally restricted awards of attorney's fees to actions involving willful infringement. *Fallaci, supra,* 568 F.Supp. at 1174; *Lauratex, supra,* 519 F.Supp. at 734; *Lauratex, supra,* 517 F.Supp. at 904. Since this action involved plainly willful infringement, costs and a full award of attorney's fees are appropriate. Plaintiffs are directed to submit an accounting of fees for a determination of reasonableness.

Section 501(c)(1) requires a copyright plaintiff to elect, "at any time before final judgment is rendered," between actual and statutory damages. *Oboler v. Goldin,* 714 F.2d 211, 213 (2d Cir.1983). Plaintiffs have avoided making an election, instead choosing to submit evidence of actual damages as well as request statutory damages. Defendants made no objection to this procedure. Because of the uncertain quality of the evidence of actual damages any other approach might well have worked a substantial injustice. In a similar circumstance, Judge Selya permitted a plaintiff to submit evidence of actual damages and selected the type of damages which, in his opinion, would "best do justice among the parties." *Milene Music, Inc., supra,* 551 F.Supp. at 1296.

I will require plaintiffs to file a notice of election stating which type of damages they prefer. If they elect actual damages and profits, final judgment for $42,239.85 plus costs and attorney's fees will be entered. If plaintiffs elect statutory damages, final judgment of $1,450,000, plus costs and attorney's fees will be entered. Plaintiffs are directed to settle on notice within twenty days a final judgment reflecting their elected damages, reasonable attorney's fees (with documentation), costs, and interest from the date of filing of the action.

It is So Ordered.

## APPENDIX A

| Artist & Title | Copyright No. | Owner | Page | Exhibit |
|---|---|---|---|---|
| Andy Gibb, "Shadow Dancing" | SR3-058 | RSO Records | 179 | 23-C,D,G,H |
| Andy Gibb, "Flowing Rivers" | N44506 | RSO Records | 181 | 23-C,D,E,G,J |
| Paul Stanley, "Kiss" | SR3-570 | Casablanca Records | 186, 170 | 23-C,E |
| Gene Simmons, "Kiss" | SR3-568 | Casablanca Records | 186, 170 | 23-C,E |
| Peter Criss, "Kiss" | SR3-569 | Casablanca Records | 186, 170 | 23-C,E |
| Ace Frehley, "Kiss" | SR3-567 | Casablanca Records | 186, 170 | 23-C,E |
| Various Artists, "Grease" | SR3-826 | RSO Records | 182 | 23-D |

**18.** These witnesses and their production companies were Sol Tischler, House of Menorah, Inc.; Marc Duverger, Marc Records; Bernard Zimney, Delta Recording; Luis Raul Bernard, Otoro Records Co. International; Jimmy "Handyman" Jones, Jen-Jillius Records; Brad Osborne, Clock Tower Records; Rangasami Parthsarathy, Oriental Records; Filberto Figueroa, El Rey Records; Carol Demas, CAP Productions; William Sanabria, Arca Records; and Ferando Vargas, Variety Recording.

| Artist & Title | Copyright No. | Owner | Page | Exhibit |
|---|---|---|---|---|
| Various Artists, "Saturday Night Fever" | SR5–560 | RSO Records | 182 | 23–C |
| Eric Clapton, "Slowhand" | SR1–112 | RSO Records | 182 | 23–D,E |
| Bee Gees, "Live" | N44505 | RSO Records | 184 | 23–E,G,J |
| Bee Gees, "Gold" | N40221 | RSO Records | 184 | 23–E,F |
| Bee Gees, "Odessa" | N40223 | RSO Records | 185 | 23–E,J |
| Village People, "Macho Man" | SR3–084 | Casablanca Records | 188 | 23–F |
| Bruce Springsteen, "Darkness on the Edge of Town" | VA7–451 | CBS | 255 | 23–C,G |
| Kenny Loggins, "Nightwatch" | SR3–234 | CBS | 256 | 23–E,F |
| Boston, "Don't Look Back" | SR4–079 | CBS | 257 | 23–E,G,J |
| Boston, "Boston" | N3––3 | CBS | 258 | 23–G,J |
| Kansas, "Point of Know Return" | N46813 | CBS | 258 | 23–G,J |
| Lynyrd Skynyrd, "Nuthin' Fancy" | N22839 | MCA Records | 317 | 23–C,D,E,J |
| Lynyrd Skynyrd, "Street Survivors" | N46364 | MCA Records | 317 | 23–C,D |
| Lynyrd Skynyrd, "First & Last" | SR3–573 | MCA Records | 318 | 23–E,F |
| Various Artists, "American Graffiti" | N11209 | MCA Records | 319 | 23–C,G |
| Olivia Newton-John, "Greatest Hits" | N46362 | MCA Records | 319 | 23–C,D,G |
| The Who, "Who Are You" | SR2–995 | MCA Records | 320 | 23–E,F |
| The Who, "The Who By Numbers" | N27399 | MCA Records | 321 | 23–E,J |
| Linda Ronstadt, "Living in the USA" | SR3–882 | Electra/Asylum | 327 | 23–G,I |
| John Denver, "Greatest Hits" | N44979 | RCA | 330 | 23–G,H |